Harry J. RENZ, Jr., and John
H. Irons, Plaintiffs,

v.

Gerald B. SHREIBER, Arnold J.
Goldstein, and J & J Snack
Foods Corp., Defendants.

Civ. A. No. 92–2527(JBS).

United States District Court,
D. New Jersey.

July 7, 1993.

Robert Agre, Cherry Hill, NJ, and Stuart H. Savett (argued), Robert P. Frutkin, Katharine M. Ryan, Savett Frutkin Podell & Ryan, Philadelphia, PA, and Marc H. Edelson, Hoffman & Edelson, Jenkintown, PA, for plaintiffs.

Stephen M. Orlofsky, Melissa A. Kelley, Jane C. Flickstein Silver, Blank, Rome, Comisky & McCauley, Cherry Hill, NJ, and Richard P. McElroy (argued), Laurence S. Shtasel, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for defendants.

## OPINION

SIMANDLE, District Judge:

This federal securities law class action is before the court on defendants' motion to dismiss the Consolidated Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The issue presented is whether plaintiffs' allegations that the defendants made optimistic public projections for success of the corporation's expected performance in sales of frozen carbonated beverages in knowing or reckless disregard of material adverse facts, continuing before and after plaintiff-shareholders purchased corporate stock in reliance upon the projections, states a claim for securities fraud under Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). For the reasons discussed below, the court will grant defendants' motion.

## I. BACKGROUND

This is a securities class action suit brought on behalf of all persons who purchased the common stock of J & J Snack Foods Corp. ("J & J" or the "Company") during the period from January 10, 1992 up to and including June 18, 1992 (the "Class

Period").[1] Defendant J & J is in the business of manufacturing and marketing nutritional snack foods to the food service, school and retail supermarket industries.[2] Its principal products include soft pretzels, frozen treats and desserts, churros, baked goods and frozen carbonated beverages ("FCBs"). Plaintiffs allege that defendants J & J, Gerald B. Shreiber, chief executive officer of J & J, and Arnold J. Goldstein, former chief financial officer of J & J, failed to disclose material adverse information, and made or participated in the making of fraudulent misstatements, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). Plaintiffs also have asserted claims for common law fraud, deceit and negligent misrepresentation.

The Consolidated Amended Complaint (or, the "Complaint") identifies several allegedly false and misleading public reports and statements made by or on behalf of J & J, and approved of or acquiesced in by defendants Shreiber and Goldstein. The Complaint alleges *inter alia* as follows:

1. On January 10, 1992, Shreiber stated:

Our short-term financial results, particularly our first and second quarters (October through March) will be impacted by the costs related to the expansion of our FCB business. We anticipate strong third and fourth quarter sales, our seasonal selling period for our beverage business. We continue to be pleased with the performance of our snack food business, including both our food service and supermarket sales, which grew over 18 percent in the first quarter. Despite the economic recessionary problems affecting the country, we are optimistic for 1992 and beyond.

Consolidated Amended Complaint at ¶ 27.

2. On January 24, 1992, J & J announced its results for the first quarter ended December 28, 1991, and defendant Goldstein commented:

Although our frozen carbonated beverage division experienced lower-than-expected sales and earnings related to the recession, our food service and retail supermarket divisions produced good results for the quarter. Food service sales were up 13 percent and sales to supermarkets were up 39 percent. Our core businesses are fundamentally strong and we are optimistic about the balance of fiscal 1992 and beyond.

Consolidated Amended Complaint at ¶ 28. J & J's Form 10–Q for the period ending December 28, 1991, which it filed with the Securities and Exchange Commission ("SEC") on February 25, 1992 and which Shreiber and Goldstein signed, reiterated the results as stated above. Consolidated Amended Complaint at ¶ 29.

3. During a conversation on or about March 17, 1992 with Richard Davis, Jr. ("Davis"), a stock analyst for Wessels, Arnold & Henderson, Goldstein told Davis, "among other things, that there was nothing unusual to report." Consolidated Amended Complaint at ¶ 30.

4. On April 10, 1992, Advest, Inc., a brokerage firm, "based upon information from the Company," issued a buy recommendation for the Company and indicated that J & J's FCB division had a soft winter, but was expected to report strong summer 1992 results. Consolidated Amended Complaint at ¶ 31.

---

1. This case actually started out as two separate class action suits. Plaintiff Harry J. Renz, Jr., originally filed his purported Class Action Complaint on June 22, 1992, and plaintiff John H. Irons filed his purported Class Action Complaint on June 24, 1992. On June 24, 1992, Magistrate Judge Joel B. Rosen entered an Order by consent consolidating these actions and providing for the filing and service of a Consolidated Amended Class Action Complaint (the "Consolidated Amended Complaint"). The plaintiffs have a pending motion to certify the class under Fed.R.Civ.P. 23. This motion will be denied by a separate Order in light of our decision here to dismiss the plaintiffs' Consolidated Amended Complaint. Because the class has not yet been certified, we will refer to this case as a "purported" or "putative" class action.

2. All facts stated herein are from plaintiffs' Consolidated Amended Complaint and documents quoted therein, which must be assumed to be true for purposes of this motion seeking to dismiss for failure to state a claim on which relief can be granted under Rule 12(b)(6), Fed.R.Civ.P.

5. On or about April 13, 1992, defendant Shreiber had a conversation with Davis and told Davis that "everything was in place for a good second half in the FCB division." Consolidated Amended Complaint at ¶ 32.

6. On April 24, 1992, J & J announced its results for the second quarter and first half ended March 28, 1992, in which sales increased 14 percent to $28,515,000 from $24,-979,000 in last year's (i.e., the previous year's) second quarter. Net earnings for the second quarter climbed 98 percent to $972,-000 compared to $491,000 last year. Shreiber allegedly stated:

> Our snack food sales and earnings were up sharply in the second quarter and overshadowed the seasonal losses of our beverage operations.... The second quarter included strong sales and earnings results for products sold to supermarkets. We are optimistic about prospects for the second half of our fiscal year when sales of our frozen carbonated beverages are generally higher.

Consolidated Amended Complaint at ¶ 33. The Company's Form 10–Q for the quarter ended March 28, 1992, filed on or about May 4, 1992 and signed by Shreiber and Goldstein, reiterated these results. Consolidated Amended Complaint at ¶ 36.

7. On or about April 28, 1992, the brokerage firm of Piper Jaffray, Inc. ("Piper Jaffray") maintained its buy recommendation and, "on information from the Company," reported that Circle K, a major new FCB customer which J & J had recently obtained, would bring J & J's incremental FCB dispensers up over 15% by year end, making incremental growth highly likely for FCB over the next two years. Consolidated Amended Complaint at ¶ 35.

8. On or about June 10, 1992, J & J representatives spoke to analysts at a Piper Jaffray conference concerning J & J's outlook and gave a positive report on J & J, neglecting to mention any alleged problems in the Company's FCB division. Consolidated Amended Complaint at ¶ 37.

9. On or about June 10, 1992, Shreiber spoke with Davis and allegedly told him that:

> the growth in the FCB business will be 20% in the second half, and 13–14% for the year. Specifically, with regard to the third quarter, defendant Shreiber told Davis that J & J had everything in place to achieve 17–18% growth for its FCB business.

Consolidated Amended Complaint at ¶ 38.

10. After the close of trading on Wednesday, June 17, 1992, Shreiber "suddenly" announced that:

> Although we expect to close out the quarter with overall healthy sales increases, disappointing results with our Frozen Carbonated Beverage business and other increased operating expenses are expected to impact earnings for the quarter....
>
> \* \* \* \* \* \*
>
> Start-up and expansion expenses in connection with the Company's Frozen Carbonated Beverage business, coupled with the interruption of sales due to a remodeling program by a major FCB customer, is expected to continue through the fourth quarter. For our fiscal year we do not expect to match last year's earnings per share of 67 cents, based on this year's weighted average number of shares of 10,-859,000.

Consolidated Amended Complaint at ¶ 40.

The start-up and expansion expenses alluded to in ¶ 40 of the Complaint refer to J & J's acquisition and expansion plan which it announced in its January 10, 1992 communique, *see* defendants' Exhibit A, as well as J & J's contract with Circle K, *see* Consolidated Amended Complaint at ¶ 41. K–Mart was the FCB customer undergoing the remodeling program. Consolidated Amended Complaint at ¶ 41. By the time trading commenced on Thursday, June 18, 1992, J & J's common stock lost 28% of its value, falling from Wednesday, June 17, 1992's closing price of $12.50 per share to $9.00 per share.

In asserting their claims, plaintiffs "rely, in part, upon the presumption of reliance established by the omission of material facts" of which they complain. Consolidated Amended Complaint at ¶ 23. They also rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine. *See id.*

at ¶ 22. More specifically, plaintiffs allege that:

    (a) defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (b) the omissions and misrepresentations were material;

    (c) the securities of the Company traded in an efficient market;

    (d) the omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

    (e) plaintiffs and the members of the Class purchased their J & J securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

*Id.*

Defendants assert that plaintiffs' allegations are insufficient as a matter of law. They move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6).[3]

## II. *DISCUSSION*

### A. Standard for Rule 12(b)(6) Motions

    ■ When considering a motion under Rule 12(b)(6), Fed.R.Civ.P., to dismiss for failure to state a claim upon which relief can be granted, the district court must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts. *See Unger v. National Residents Matching Program,* 928 F.2d 1392, 1400 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990). *See also Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (stating that allegations of a complaint should be favorably construed for the pleader). A court may not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

    ■ Normally, courts may not review matters outside of the pleadings on motions to dismiss. When a court reviews such outside materials, the motion is transformed into one for summary judgment under Fed. R.Civ.P. 56, *see* Fed.R.Civ.P. 12(b), and the court must apply a different standard of decision. If a court decides to treat a motion to dismiss as one for summary judgment, all parties must be given a reasonable opportunity to present all other materials made pertinent by Rule 56. Here, defendants ask us to review certain exhibits annexed to their Memorandum of Law in Support of Motion of Defendants to Dismiss Consolidated Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (hereinafter, "Defendants' Brief"), without converting their motion into one for summary judgment. Plaintiffs, however, argue that defendants' exhibits "are irrelevant and must be ignored." Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (hereinafter, "Plaintiffs' Brief") at 10.

    Two of the exhibits in question (Exhibits A and C) are the full text of documents from which plaintiffs quoted selected excerpts in their Consolidated Amended Complaint. *See* Complaint at ¶ 27 (quoting language contained in Exhibit A) and ¶ 33 (quoting language contained in Exhibit C). Two of the exhibits (B and D) are copies of, respectively, J & J's first and second quarter reports which were distributed to, among others, J & J's "shareholders and friends." Though plaintiffs do not quote directly from these documents, they do quote from and/or cite other J & J public documents which announced the same exact quarterly results as those announced in Exhibits B and D. *See* Consolidated Amended Complaint at ¶¶ 28, 29, 33 and 36.[4] Defendants' Exhibit E is a

---

3. We note that, unlike many other defendants moving to dismiss a securities fraud suit, the defendants here have not moved in the alternative to dismiss pursuant to Fed.R.Civ.P. 9(b) for failure to state with the requisite particularity the circumstances comprising the alleged fraud.

4. Paragraph 36 of the Complaint cites to the Company's Form 10–Q for the quarter ending March 28, 1992, which was filed with the SEC on or about May 4, 1992. This Form 10–Q, which the defendants quoted from in their moving brief but inadvertently failed to attach to

copy of J & J's third quarter report, which announces the Company's actual third quarter performance, about which defendants made the projections that are now the basis for this suit.

If the plaintiffs had attached the full text of these documents to their Complaint, the documents would have been considered part of the Complaint and unquestionably reviewable on this Rule 12(b)(6) motion to dismiss. *See* Fed.R.Civ.P. 10(c). *See also* 5 C. Wright & A. Miller, *Federal Practice and Procedure: Civil 2d*, § 1327 at 761 (1990). It is also proper for us to consider the text of these documents in this Rule 12(b)(6) motion without converting the motion into one for summary judgment under Rule 56. These documents are clearly pertinent to the plaintiffs' allegations because the contents of these documents have been excerpted or summarized in plaintiffs' Complaint. Moreover, reference to the full texts is necessary to place the defendants' statements and the Company's financial statistics cited by the plaintiffs in their Consolidated Amended Complaint into the proper context. Plaintiffs cannot fairly ask us to consider this information in a vacuum divorced from the other directly related, contemporaneous statements and disclosures made by the defendants. *See Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n. 3 (1st Cir.1991); *Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988) (stating that in considering Rule 12(b)(6) motion to dismiss, court may review documents submitted by defendants which "are integral to plaintiff's claims"); *In re Donald J. Trump Casino Securities Litigation*, 793 F.Supp. 543, 546 n. 1, 547 (D.N.J.1992) (hereinafter, *"Trump"*). *See also* 5 Wright & Miller, *Federal Practice and Procedure*, § 1327 at 762–63 ("[W]hen plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading"). Therefore, we hold that the consideration of defendants' Exhibits A–E—each of which has been excerpted, summarized or alluded to in plaintiffs' Consolidated Amended Complaint—is appropriate in this Rule 12(b)(6) motion and such consideration does not raise matters outside

their Exhibit C, was subsequently submitted to

the pleadings to trigger summary judgment consideration.

**B. Plaintiffs' Standing to Assert Post–Purchase Statements**

■ Before reviewing the alleged misleading statements in light of the applicable law, we must first determine which statements the court can rightly review. Defendants argue that certain of the alleged statements upon which plaintiffs base their suit are not actionable, and that plaintiffs do not have standing to assert claims based upon any of these statements. *See* Defendants' Reply Brief in Further Support of [Their] Motion to Dismiss the Consolidated Amended Complaint (hereinafter, "Defendants' Reply Brief"), at 2–10. Indeed, defendants assert that "[t]he motion to dismiss can easily be disposed of on this basis alone." *Id.* at 10. The courts seem to be split on this issue, and the case law arguably can be interpreted to support fully both parties' positions.

According to the Complaint, plaintiff Irons purchased five hundred shares of J & J common stock on January 14, 1992, Consolidated Amended Complaint at ¶ 7, and plaintiff Renz purchased five hundred shares of J & J common stock on March 2, 1992, *id.* at ¶ 6. Irons and Renz are the two named plaintiffs in this purported class action. The statements (and omissions) upon which the Complaint is founded were allegedly made over the five month period between January 10, 1992, and June 17, 1992. Defendants argue that this court may not consider any of the alleged misrepresentations or omissions which occurred after March 2, 1992, nor may any of those alleged post-March 2, 1992 misrepresentations or omissions serve as a basis for plaintiffs' suit. Defendants cite various cases in support of their position.

For example, defendants cite this court's Opinion in *Trump*, in which Chief Judge John F. Gerry held that "[p]laintiffs cannot rely on statements made subsequent to their purchases in order to state a securities fraud claim, because plaintiffs could not have relied on the statements in making their purchases in the first place." *Id.*, 793 F.Supp. at 565

and reviewed by the Court. *See* note 15, *infra.*

(holding post-purchase statements reported in various media sources not actionable) (citing *Schwartz v. Novo Industri A/S*, 658 F.Supp. 795 (S.D.N.Y.1987)). Chief Judge Gerry continued on to explain that " 'no liability attaches to statements made after the transaction [and t]herefore [plaintiff's] allegations regarding after-made statements do not state a claim.' " *Trump* at 565 (quoting *Stevens v. Equidyne Extractive Industries*, 694 F.Supp. 1057, 1064 (S.D.N.Y.1988)).

In *Trump*, the plaintiffs noted that they, like the plaintiffs here, represented a putative class, and stated that potential members of the class may have purchased bonds subsequent to, and in reliance on, the statements at issue. *Id.*, 793 F.Supp. at 566. Chief Judge Gerry did not find this reasoning persuasive. He concluded:

> The named plaintiffs could not represent a class which included bondholders who purchased after these statements were printed, as all of the named plaintiffs purchased prior to circulation of those statements.... "The fact that a case is brought as a class action does not change the calculus; named plaintiffs 'cannot represent a class of whom they are not a part.' "

*Id.* (quoting *Haft v. Eastland Financial Corp.*, 772 F.Supp. 1315, 1316 (D.R.I.1991) (citations omitted)). *See also Adair v. Sorenson*, 134 F.R.D. 13, 16 (D.Mass.1991) ("A court must assess standing to sue based upon the standing of the named plaintiff and not upon the standing of unidentified class members") (citation omitted);[5] *Levine v. NL In-*

dustries, Inc., 720 F.Supp. 305, 308 (S.D.N.Y. 1989) (holding post-purchase statements not actionable under § 10(b) by a class represented by plaintiff) (citing *Denny v. Barber*, 576 F.2d 465, 468–69 (2d Cir.1978), and *Schwartz, supra*, 658 F.Supp. at 799–800).

On the other hand, the common thread running through the cases cited by plaintiffs is the finding of an alleged "common scheme to defraud" or "interrelated misstatements and omissions" by the defendants. In *Robbins v. Moore Medical Corp.*, 788 F.Supp. 179 (S.D.N.Y.1992), for example, the court, in denying defendants' motion to dismiss,[6] ruled that the class representatives did have standing to assert claims under § 10(b) which arose from statements made after the class representatives had purchased their shares "if the statements allegedly were made in the furtherance of a common scheme to defraud."[7] *Id.* at 187. The *Robbins* court cited Judge Robert W. Sweet's opinion denying defendants' motion to dismiss pursuant to Fed.R.Civ.P. 9(b) in *Nicholas v. Poughkeepsie Savings Bank/FSB*, 1990 WL 145154, Fed.Sec.L.Rep. (CCH), ¶ 95,606 (S.D.N.Y. 1990). In *Nicholas*, Judge Sweet stated:

> Nicholas has alleged a common course of conduct by defendants to harm the Class. Whether plaintiff and other class members bought early in the Class Period or late, they are all alleged to have been injured by the inter-related misstatements and omissions.... [D]efendants' argument implies that only someone who bought on

---

**5.** The *Adair* court (in ruling on a motion for class certification) also stated:

> Plaintiff cannot establish that he relied on events which occurred after he purchased his stock. Any injuries sustained by Mr. Adair necessarily resulted from events occurring prior to his last purchase on July 14, 1988. [Citations omitted.] Thus, plaintiff has standing to assert a claim under Rule 10b–5 arising from events prior to July 14, 1988. He, on the other hand, lacks standing to assert a 10b–5 claim based on the August 2, 1988 announcement and, therefore, cannot represent those class members who purchased after July 14, 1988.

*Id.*, 134 F.R.D. at 16. The court thus concluded that plaintiff could not maintain an action based on the August 2, 1988 announcement on behalf of the class, and limited the claim accordingly. *Id.* at 16, 20.

**6.** The Class in *Robbins* had not yet been certified by the time the court ruled on the motion to dismiss. The court had reserved decision on the issue of class certification pending resolution of the dismissal motion. *See id.*, 788 F.Supp. at 188 n. 6.

**7.** The court nevertheless concluded, however, "that the date of purchase may, but need not necessarily, be significant, and that defendants are entitled to a specification of the date so that they can determine the effect of the date of purchase with regard to the validity of Robbins' complaint and what action, if any, they (the defendants) should take because of the particular date in question." 788 F.Supp. at 187–88.

the last day of a Class Period would be able to bring an action.... Such arguments have been made and rejected by other courts.

*Id.,* 1990 WL 145154 at * 5–6 (citing *Gould v. Marlon,* Fed.Sec.L.Rep. (CCH) ¶ 93,408 at 97,126, 1987 WL 34631 (D.Nev.1987), and *Shamberg v. Ahlstrom,* 111 F.R.D. 689, 697 (D.N.J.1986) (referring to a "common course of conduct" in context of motion for class certification)).

Similarly, the court in *Hoexter v. Simmons,* 140 F.R.D. 416 (D.Ariz.1991), in the context of a motion for class certification, found the class representatives to have standing to sue on behalf of later-purchasing class members. The court stated:

> The named plaintiffs may not have standing to sue for harm caused entirely by specific statements made after they had purchased stock. The claims the Class representatives seek to make on behalf of later purchasers, however, do not arise from specific, isolated statements made af-

ter [the last day on which any of the Class representatives purchased the stock,] but rather from a *series of alleged interrelated misrepresentations made over the entire relevant period.* Thus, the court perceives no problems with standing ... arising from the inclusion of later purchasers in the Class.

*Id.* at 422 (emphasis added).[8] We believe that the statements alleged here fall within this common scheme to defraud theory, and that Irons and Renz can legitimately invoke this theory to confer standing upon them, the named putative class representatives, to assert claims based in part upon the statements made after March 2, 1992 (the "post-purchase statements").

Reasonable reliance upon an alleged misrepresentation is a necessary element of a Rule 10b–5 claim. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). It is beyond dispute that the plaintiffs here (Irons and Renz) cannot assert reliance, actual or otherwise,[9] on the post-

---

**8.** In *Adair,* 134 F.R.D. 13, the court distinguished the cases which recognized this "common course of conduct" theory. *Id.* at 16 n. 3. The court stated that the courts which relied on this theory did so in the context of construing the "typicality" requirement of Fed.R.Civ.P. 23(a)(3). *Id.* "The issue of standing," the court said, "must be overcome before the Court considers the typicality of claims required by Rule 23." *Id.* (citing *Gabrielsen v. Banctexas Group, Inc.,* 675 F.Supp. 367, 371 n. 3 (N.D.Tex.1987) (citing *Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir.1981))). In fact, however, not all courts have considered the common course of conduct theory solely within the relatively more narrow "typicality" context. Some have invoked it while addressing the broader issue of standing. *See Hoexter,* 140 F.R.D. 416; *Robbins,* 788 F.Supp. 179; *Nicholas,* 1990 WL 145154, Fed.Sec.L.Rep. (CCH), ¶ 95,606.

**9.** As noted earlier, the plaintiffs rely in part on the "fraud-on-the-market" theory. Complaint at ¶¶ 22–24. This theory has been explained by the United States Supreme Court as follows:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase

of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic, Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988) (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir.1986)).

Neither the plaintiffs' reliance upon nor this court's acceptance of this doctrine resolves the dispute over whether this court can consider the post-purchase statements. The fraud-on-the-market theory dispenses with the traditional requirement that each individual plaintiff show actual reliance on the defendants' statements or omissions, and creates a rebuttable presumption of reliance based upon a sophisticated, "open and developed" market. *See Hayes v. Gross,* 982 F.2d 104, 107 (3d Cir.1992) (citing *Basic, supra* ). This theory enables plaintiffs to sue upon statements upon which they had not personally relied when deciding whether to purchase their shares, on the assumption that these statements and the information they conveyed were considered and integrated by "the market" and thus affected the market price of the shares bought and/or sold by the plaintiffs. While this theory may provide support for the plaintiffs in the context of an application for class certification, *see Basic,* 485 U.S. at 241–47, 108 S.Ct. at 988–92, it merely begs the specific question presently in dispute. Can Renz and Irons sue upon the fraud on the market which defendants allegedly carried out after plaintiffs purchased their shares? Stated differently, can plaintiffs Irons and Renz legitimately complain they were injured by post-pur-

purchase statements.[10] One cannot rely on an event which has not yet occurred. But the post-purchase statements (and omissions) could be viewed as evidence of a "series of alleged interrelated misrepresentations made over the entire" Class Period, *Hoexter*, 140 F.R.D. at 422. In essence, the defendants are accused of deliberately downplaying, if not completely misleading the public about, the seriousness of certain problems affecting J & J's FCB division, and of issuing knowingly over-optimistic statements about the prospects for the second half of J & J's fiscal year. The challenged statements are all similar in nature in that they involve optimistic projections which defendants Shreiber and Goldstein allegedly made in knowing or reckless disregard of certain material adverse facts.

This case is thus distinguishable from *Trump*. In *Trump*, the named representatives of the putative class relied in fact upon only a single prospectus, which Chief Judge Gerry ruled could serve as the basis for plaintiffs' Rule 10b–5 claim (though he ultimately dismissed the claim on the merits). The post-purchase statements ruled non-actionable by Chief Judge Gerry involved alleged remarks by Donald Trump which were reported in various media sources. *Id.*, 793 F.Supp. at 565. These alleged remarks quoted by the media were of a different character than the representations deliberately set forth in the prospectus after careful thought and review by lawyers and other professionals. Moreover, *none* of those reported remarks were made before any of the named plaintiffs made their purchases. They there-

fore could not have relied on any of Trump's alleged statements to the press.

We believe that in addition to the justification offered above, there is an additional reason for considering the post-purchase statements (and omissions). After holding that a plaintiff did not have standing to assert post-purchase statements as a basis for a Rule 10b–5 claim, *see* 772 F.Supp. at 1317–18, the court in *Haft, supra,* addressed the question of whether the post-purchase statements could be considered as "circumstantial evidence" of fraud, *id.* at 1321. The *Haft* court reviewed the post-purchase statements to see if they represented " 'circumstantial evidence of the fraud [plaintiff] alleges occurred prior to his stock purchase.' " *Id.* (quoting *Schwartz*, 658 F.Supp. at 799).[11]

Similarly, we believe plaintiffs here should be permitted to proffer the post-purchase statements and omissions as circumstantial evidence of fraudulent intent with respect to the pre-purchase statements, even though plaintiffs here cannot assert reliance, actual or otherwise, on the post-purchase statements. This court therefore will consider all of the challenged statements in reviewing defendants' motion to dismiss.

Having resolved the question of what statements the plaintiffs may rely upon as support for their instant suit, we may now turn to the substance of plaintiffs' allegations. Have plaintiffs stated a claim upon which relief can be granted?

## C. Elements of a Claim Under Section 10(b) and Rule 10b–5

In order to state a claim under § 10(b) [12] of the Securities Exchange Act of

---

chase, allegedly fraudulent statements and omissions which common sense says could have affected the market price of J & J's stock, if they affected it at all, only *after* Irons and Renz purchased their shares?

**10.** Irons himself cannot assert reliance on any statements made after January 14, 1992, the date of his last purchase.

**11.** After concluding that the three post-purchase statements were "not in themselves actionable under Section 10(b)[,]" the *Schwartz* court noted that throughout its Opinion, it had "indeed viewed the three pre-purchase statements in light of subsequent events[,]" *id.*, 658 F.Supp. at 799, even though the court did not consider the post-

purchase statements as "primary" evidence of fraud for purposes of its opinion, *id.* at 800 n. 18. *See also Nicholas*, 1990 WL 145154 at * 5 (stating that plaintiff "has alleged false and misleading statements prior to [her date of purchase], as well as the integrity of the market, which form the basis of her personal claim against defendants. Post-purchase statements are relevant to the course of wrongful conduct alleged by a plaintiff in a securities action and Nicholas has sued on behalf of the Class of persons who purchased stock during the entire Class Period").

**12.** Section 10(b), 15 U.S.C. § 78j(b), provides in pertinent part:

    It shall be unlawful for any person, directly or indirectly ...

1934 and Rule 10b–5 [13] promulgated thereunder, a plaintiff must plead the following elements:

> (1) a false representation of (2) a material (3) fact; (4) defendant's knowledge of its falsity and his intention that plaintiff rely on it [although recklessness, as opposed to actual intent, will suffice]; [14] (5) the plaintiff's reasonable reliance thereon; and (6) his resultant loss.

*Lewis v. Chrysler Corp.,* 949 F.2d 644, 649 (3d Cir.1991) (citation omitted) (brackets in original). *See also Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir.1992); *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 280 (3d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). As Rule 10b–5 explicitly provides, omissions of material facts, in addition to affirmative misrepresentations thereof, are actionable.

With respect to omissions, the key is materiality. "The Supreme Court has been 'careful not to set too low a standard of materiality' in order to avoid 'an overabundance of information' especially concerning corporate developments of 'dubious significance.'" *Lewis,* 949 F.2d at 649 (quoting *Basic v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)). An omitted fact is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See also Basic,* 485 U.S. at 232, 108 S.Ct. at 983 (expressly adopting the materiality standard of *TSC Industries,* which involved § 14(a) and Rule 14a–9, for use in § 10(b) and Rule 10b–5 cases); *Shapiro,* 964 F.2d at 280 n. 11.

### D. Plaintiffs' Allegations

■ Plaintiffs' theory of liability is summarized in paragraph 44 of their Consolidated Amended Complaint. There, plaintiffs assert that the statements (reproduced earlier in this Opinion) made by and on behalf of J & J:

> were materially false and misleading during the Class Period. The true facts were contrary to the defendants' representations about its FCB business and its future financial prospects. Nevertheless, the defendants made statements which they knew or had reason to know were false and misleading, and omitted to state material facts necessary to make those statements not misleading. Defendants also issued statements and reassurances for which they had no reasonable basis, including the statements about its FCB business and its

---

13. Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality ...
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

And earlier footnote text:

> (b) To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

14. This element is commonly referred to as the "scienter" requirement. "Scienter" is defined as "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Dirks v. SEC,* 463 U.S. 646, 663 n. 23, 103 S.Ct. 3255, 3266 n. 23, 77 L.Ed.2d 911 (1983) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1380–82 n. 12, 47 L.Ed.2d 668 (1976)). As noted in the text, the Third Circuit has held that recklessness on the part of a defendant satisfies the scienter requirement of § 10(b) and Rule 10b–5. *See also In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1244 (3d Cir.1989) (citing *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 649 (3d Cir.1980)). "Recklessness," in turn, is defined as:

> 'an extreme departure from the standard of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must be aware of it.'

*Healey,* 616 F.2d at 649 (quoting *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977)).

future financial prospects. The false and misleading statements of material facts made to the investment community, and the material facts which defendants failed or omitted to disclose include the fact that costs of starting up and expanding its FCB business, coupled with the interruption of sales due to the remodeling program by a major FCB customer, K–Mart, would negatively impact its third quarter financial results and continue to impact 4th quarter results.

Consolidated Amended Complaint at ¶ 44.

In response, defendants argue that the statements at issue are merely non-actionable opinions and predictions about J & J's future financial prospects. They emphasize the absence of any allegation in the Complaint that any of the facts stated were untrue, or that J & J failed to disclose the fact of the FCB start-up and expansion costs or the fact of K–Mart's remodeling program. Defendants further focus on what they characterize as plaintiffs' primary, underlying complaint: that defendants' did not predict accurately and state that the expansion costs and the remodeling program "would" detrimentally affect J & J's financial performance in the third and fourth quarters of its 1992 fiscal year. *See* Defendants' Brief at 5–7.

Defendants did indeed disclose the facts of J & J's FCB expansion and acquisition program and the remodelling program at K–Mart. In addition, not only did they disclose the basic fact of these two programs' existence, the defendants also disclosed the negative impact they had on J & J's first and second quarter financial results. Of this there cannot be—nor is there—any dispute. *See* Plaintiffs' Brief at 13–14. For example, on February 14, 1992, Shreiber explained, in the Company's First Quarter Report, some of the reasons why J & J's FCB business had been sluggish:

> Frozen Carbonated Beverage sales were essentially flat for the quarter, despite new location installations. Same store sales were below last year's same period levels. *Remodeling programs initiated by one of our major FCB customers and the weak economy had a significant impact on sales.* Overall, expansion continues in this

division and new customer installations for both ICEE and Frozen Coke scheduled for the second and third quarters are at record levels.

> \* \* \* \* \* \*

> Our core businesses are fundamentally strong and remain fertile. Our financial condition is excellent and we will continue to manage and grow our business for the long term.

Exhibit B, annexed to Defendants' Brief (emphasis added).

On April 24, 1992, in announcing its second quarter results, J & J once again disclosed that the K–Mart remodeling program and increased costs had negative effects on J & J's FCB business:

> Frozen carbonated beverage and related product sales increased $278,000 or 4% to $6,989,000 in the second quarter and $177,-000 or 1% to $14,581,000 in the first half. Beverage sales alone increased 5% to $6,043,000 in the quarter and 2% to $12,-619,000 in the first half. The lack of a significant sales increase, especially considering the increased number of beverage dispensers at customer locations compared to a year ago, *is due to a disruption of sales related to a remodeling program of a major chain store customer* and the effects of the recession, especially in key California and Michigan markets.

> \* \* \* \* \* \*

> Gross profit as a percentage of sales was 51% in the second quarter and first half, compared to 52% in last year's comparable period. The decrease, which is actually less than one-half percentage point for both periods, *is related to cost increases and sales mix.*

> \* \* \* \* \* \*

Although supermarket marketing expenses declined as a percentage of sales to supermarkets, *frozen carbonated beverage division marketing expenses increased substantially* as a percentage of its sales....

J & J's Form 10–Q for the second quarter ending March 28, 1992 (emphasis added).[15]

On May 1, 1992, in J & J's Second Quarter Report, Shreiber yet again described the adverse consequences of the remodeling program:

> Our Frozen Carbonated Beverage division sales, including ICEE and Frozen Coke brands, were up a modest 4% for the quarter and 1% for the six month period. *We continue to be impacted by remodeling programs causing both interruption of sales and relocations of snack bars at one of our major FCB customers.* Despite this disappointing period for our FCB business, we remain confident about our second half prospects. Scheduled installations for ICEE dispensers are at an all time high level. New customers, including convenience stores, warehouse clubs and fast food restaurants, are being installed at a record pace. We believe we have the essentials in place and are optimistic about the upcoming FCB selling season.

Exhibit D, annexed to Defendants' Brief (emphasis added).

Plaintiffs acknowledge that defendants disclosed the facts about the costs associated with the expansion program and K–Mart's remodeling program. *See* Plaintiffs' Brief at 13–14. They nevertheless contend that the issue of disclosure of these facts "is an argument going to the sufficiency of the disclosure, and is therefore an argument concerning the materiality of the alleged statements, an inherently fact specific inquiry." Plaintiffs' Brief at 14 (citing cases). We do not doubt that both the challenged statements and the underlying facts are material. We assume for purposes of this Rule 12(b)(6) motion that investors would consider the optimistic projections, as well as the admittedly disclosed facts which had the potential to impact negatively upon J & J's future performance, "important" to their decisionmaking and were entitled to this information. *See Basic*, 485 U.S. at 231, 108 S.Ct. at 983. The question, then, more accurately boils down to whether the plaintiffs' allegations that defendants made knowingly or recklessly false and misleading prognostications about third and fourth quarter sales can stand in light of the facts appearing in the pleadings and referenced documents themselves.

The Third Circuit has recognized that "projections, forecasts and opinions are actionable [under § 10(b) and Rule 10b–5] as misleading in a variety of circumstances." *Eisenberg v. Gagnon*, 766 F.2d 770, 775 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (citations omitted). They are actionable if a plaintiff can establish the inaccuracy of at least one of the three following factual assertions "implicit" in a projection or forecast: "(1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied sub nom., Schneider v. Apple Computer, Inc.*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). *See also Virginia Bankshares, Inc. v. Sandberg*, — U.S. —, — – —, 111 S.Ct. 2749, 2758–60, 115 L.Ed.2d 929 (1991) (holding that conclusory statements or expressions of opinion or belief can give rise to liability under the securities laws if the plaintiff can proffer "provable facts" demonstrating that the opinion or belief was not or could not have been bona fide); *In re Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645–46 (3d Cir. 1989) ("[a] projection that is issued without a reasonable basis is an untrue statement and

---

**15.** J & J's Form 10–Q is annexed to the letter dated June 30, 1993 from Richard P. McElroy, Esq. to the undersigned, and was submitted to the Court in response to an inquiry from the Court of earlier that same date. The defendants had originally quoted this language from the Form 10–Q at pp. 14–15 of their moving brief, citing their Exhibit C. The Court's version of Exhibit C, a one page announcement from defendant Goldstein dated April 24, 1992, did not contain a copy of the Form 10–Q, however. The plaintiffs refer to the Company's Form 10–Q for the second quarter ending March 28, 1992 in ¶ 36 of the Consolidated Amended Complaint. In addition, this Form 10–Q accompanied defendant Goldstein's April 24, 1992 announcement (defendants' Exhibit C), *see* McElroy's June 30, 1993 letter, to which the plaintiffs refer at ¶ 33 of their Consolidated Amended Complaint.

actionable under § 10(b) and Rule 10b–5 if made knowingly or recklessly"); *Eisenberg,* 766 F.2d at 776 ("An opinion or projection, like any other representation, will be untrue if it has no valid basis . . ., but 'a reasoned and justified statement of opinion, one with a sound factual or historical basis, is not actionable' ") (citations omitted).

Defendants argue that plaintiffs have not offered objective evidence to back up their claims. Indeed, defendants assert that plaintiffs have failed to provide any foundation for their allegations that defendants did not in fact believe their optimistic projections or that they had no reasonable basis for their belief. Defendants' Brief at 20. Moreover, defendants contend, the plaintiffs do not even allege that J & J's optimistic projections were not met. *Id.* at 21. In actuality, defendants assert, the facts indicate that defendants' predictions were justified. *Id.* In support of this assertion, defendants cite the Company's third quarter report, which was issued on July 23, 1992. In the Report, defendant Shreiber stated:

> We achieved increased sales and earnings for our third quarter ended June 27, 1992. Overall revenues climbed nearly 17% to $33,478,000 from $28,632,000. Net earnings increased to $1,840,000 from $1,760,000 for the year ago period. Earnings per share were $.17 vs. $.20, based on 10,808,000 shares this year compared to 8,958,000 a year ago.
>
> \*   \*   \*   \*   \*   \*
>
> Frozen Carbonated Beverage (FCB) sales . . . were higher for the quarter—gaining 15%—but below our expectations. Remodeling programs, including temporary closings and relocation of snack bars at one of our major FCB customers, have impacted our FCB group. Remodeled unit store sales are running below last year's comparable period levels.

Exhibit E, annexed to Defendants' Brief.

Given J & J's actual financial results for the third quarter, it would appear that defendants' optimistic projections were all but borne out. In their Consolidated Amended Complaint, plaintiffs complain about defendants' statements predicting increased *sales,* see Complaint at ¶¶ 27 and 33, and about their expressed optimism for the second half of J & J's fiscal year, *id.* at ¶¶ 27, 28, 32, 33, 35, 37 and 38. As the third quarter report indicates, J & J indeed experienced overall increases in sales, revenues and earnings. *See* Defendants' Exhibit E. The Company's earnings per share did decrease slightly by $.03 per share (from $.20 to $.17, or 15%), as compared with the comparable period of the previous year due to the increase in the number of shares outstanding (from 8,958,000 shares to 10,808,000, an increase of 20.6%). *Id.* But as defendants point out, never in any of the challenged statements did they make any prediction regarding J & J's future earnings per share or, for that matter, its overall earnings. In addition, not only did J & J do fairly well overall in the third quarter, its FCB division in particular also experienced an increase ·in sales. J & J's FCB sales were fifteen percent (15%) higher for the third quarter, albeit admittedly slightly below J & J's expectations of 17–18% growth for the FCB business [as predicted by Shreiber on June 10, 1992, *see* Consolidated Amended Complaint at ¶ 38, *supra* ]. Defendants' Brief at 21 (citing J & J's third quarter report, defendants' Exhibit E).

Plaintiffs nevertheless allege that "defendants made statements which they knew or had reason to know were false and misleading, and omitted to state material facts necessary to make those statements not misleading." Consolidated Amended Complaint at ¶ 44. According to plaintiffs, the "material facts which defendants failed or omitted to disclose include the fact that costs of starting up and expanding its FCB business, coupled with *the interruption of sales due to the* remodeling program by a major FCB customer, K–Mart, *would* negatively impact its third quarter financial results and continue to impact its 4th quarter results." Consolidated Amended Complaint at ¶¶ 44 (emphasis added). *See also id.* at ¶¶ 48 and 57.

▇▇▇ This is a motion to dismiss pursuant to Rule 12(b)(6), not one for summary judgment under Rule 56.[16] On a motion to dis-

---

**16.** As we noted *supra* note 3, these defendants, unlike many other defendants in other securities

miss, we must accept as true all the facts pleaded in the complaint as well as any *reasonable* inferences derived from those facts. *See Hayes, supra,* 982 F.2d at 105–06, 107 n. 1; *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1400 (3d Cir.1991). *But see Trump,* 793 F.Supp. at 557 (stating that "[w]hile we are instructed to draw all reasonable inferences in favor of a complainant, we concur with the reasoning of *DiLeo [v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) ], that no reasonable inferences of fraud can be drawn from conclusory allegations devoid of factual basis").

As noted, the defendants argue that the plaintiffs must show "objective evidence" that the challenged statements represent a dishonestly held belief, or a belief without a reasonable basis. *See* Defendants' Brief at 19. A couple of courts have spoken of this "objective evidence" requirement. *Trump,* 793 F.Supp. at 557 (citing *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991)).[17] *See also Virginia Bankshares,* —— U.S. at ——, 111 S.Ct. at 2760 (speaking with respect to § 14(a) of the Securities Exchange Act). While we take note of this language, we must also consider the Third Circuit's repeated admonition that it is not necessary for a plaintiff to plead evidence. *See Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977); *see also District Council 47, AFSCME v. Bradley,* 795 F.2d 310, 315 (3d Cir.1986); *United States v. $55,518.05 in U.S. Currency,* 728 F.2d 192, 198 n. 1 (3d Cir.1984) (Garth, J., dissenting).

Thus if this case turned merely upon whether the pleadings recite the barebones elements of a securities fraud claim under the template elements of *Lewis, Shapiro, Hayes* and similar cases, the inquiry would be at an end and the Rule 12(b)(6) motion would be denied so that discovery would go forward. But the· pleadings at issue contain explicit allegations of the opinions and predictions of defendants, which are alleged to be misrepresentations and distortions, as well as the outcomes or developments which allegedly render those statements or omissions actionable. The issue, then, is not whether the elements of securities fraud have been alleged, but rather whether the alleged factual basis for those elements could support the claim and entitle plaintiffs to relief, giving plaintiffs all reasonable inferences derived from those facts, upon examination of the Complaint and related documents.

This court must examine plaintiffs' assertions that defendants' representations about the FCB business and its future financial prospects were false and misleading—and specifically that "defendants failed or omitted to disclose ... the fact that costs of starting up and expanding its FCB business, coupled with the interruption of sales due to the remodeling program by a major FCB customer, K–Mart, would negatively impact its third quarter financial results and continue to impact fourth quarter results," under ¶ 44 of the Consolidated Amended Complaint—in light of the actual facts contained in the pleadings. If upon those pleaded facts plaintiffs cannot prevail as a matter of law, then the court must grant the dismissal motion.

---

fraud suits, have not moved in the alternative to dismiss under Fed.R.Civ.P. 9(b) for failure to plead fraud with the requisite particularity. We thus do not hold the plaintiffs to the heightened pleading requirement of Rule 9(b) as it has been interpreted by various courts, including the Third Circuit in *In re Craftmatic Securities Litigation,* 890 F.2d at 644–46.

**17.** The rule requiring objective evidence is motivated by the danger of what Judge Friendly called "fraud by hindsight," *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). As this and other courts have previously explained, "[t]he fact that a projection or estimate turned out to be incorrect, standing alone, does not even raise an inference that the statement was fraudulent when

made." *Urbach v. Sayles,* 779 F.Supp. 351, 358 (D.N.J.1991). *See also Trump,* 793 F.Supp. at 557. (In addition to expressing concern over the dangers raised by claims of "fraud by hindsight," Chief Judge Gerry primarily relied upon the "bespeaks caution" doctrine in dismissing the Complaint in *Trump.* "The essence of the [bespeaks caution] doctrine is that where an offering statement, such as a prospectus, accompanies statements of its future forecasts, projections and expectations with adequate cautionary language, those statements are not actionable as securities fraud." *Id.,* 793 F.Supp. at 549. This doctrine is not pertinent to and has no bearing upon our resolution of the presently pending motion.)

*First,* did defendants give misleading or false information about costs of starting up and expanding the FCB business? According to plaintiffs' pleadings, Shreiber disclosed on January 10, 1992, that the "short-term financial results, particularly our first and second quarters (October through March) will be impacted by the costs related to the expansion of our FCB business. We anticipate strong third and fourth quarter sales, our seasonal selling period for our beverage business." Consolidated Amended Complaint at ¶ 27, *supra.* Shreiber explained, on February 14, 1992, why the FCB business had been sluggish, reporting "essentially flat" FCB sales despite new location installations. First Quarter Report, Ex. B to Defendants' Brief, *supra.* The company also reported on April 24, 1992 that FCB marketing expenses "increased substantially." Second Quarter Report, *supra.*

These disclosures were indeed accurate. The company was predicting that costs related to expansion of its FCB business "will" impact short-term financial results. The prediction that the financial impact of these costs will be felt particularly in the first and second quarters was also correct, as the third-quarter results showed a marked upsurge in FCB performance compared with the first and second, as discussed above. The anticipation of "strong" third and fourth quarter FCB sales was likewise accurate, as third quarter FCB sales increased 15%, as discussed above. Third Quarter Report, July 23, 1992, *supra.* (Fourth Quarter results are not alleged in the pleadings, nor have plaintiffs alleged that the fourth quarter FCB sales were not "strong.") Therefore, because the defendants gave accurate predictions about the costs of starting up and expanding the FCB business, short term financial results, and FCB sales, when measured against actual experience, there are no facts upon which plaintiffs can show that defendants' statements or omissions on these topics amounted to false or misleading information.

*Second,* did defendants give misleading or false information about the interruption of sales by the major FCB customer, K–Mart? The defendants accurately disclosed, in the first quarter report, that "[r]emodeling programs initiated by one of our major FCB customers and the weak economy had a significant impact on sales." First Quarter Report, Feb. 14, 1992, *supra.* The impact of the K–Mart renovations were again accurately disclosed in commenting on second quarter results on April 24, 1992, in which the "lack of a significant sales increase" was attributed to "a disruption of sales related to a remodeling program of a major chain store customer." Statement of April 24, 1992, *supra.* Similarly, defendants disclosed on May 1, 1992, that "[w]e continue to be impacted by remodeling programs causing both interruption of sales and relocations of snack bars at one of our major FCB customers [K–Mart]." Second Quarter Report, *supra.* Upon these facts, it is not conceivable that any reasonable jury could find that Shreiber's June 17th announcement of disappointing results due to the major customer's remodeling program was some sort of surprise unanticipated by the defendants' prior disclosures. As a matter of law and fact, defendants' disclosures regarding the remodeling program's impact were not false or misleading.[18]

*Third,* were Shreiber's predictions on June 10th about growth in FCB business false or misleading? Shreiber's June 10th prediction that third-quarter growth of the FCB business would be 17–18% was made before the

---

**18.** Plaintiffs argue that fraud can be inferred here from the fact that when J & J's stock opened for trading on June 18, 1992, the Company's stock lost 28% of its value, falling to $9.00 per share from its June 17th closing price of $12.50 per share. We do not believe that any inference of fraud could be found based solely on an arguably sharp decline in the price of a company's stock. If it could, then the courts would be inundated with "aggrieved" investors crying fraud every time a company's announced performance does not meet the market's expectations and, as a result, the price of the company's stock falls. The securities laws were not intended to provide relief for bad investment decisions. The fact that the market guessed wrong about J & J might be further evidence that financial analysts are not omniscient and that the stock market involves taking risks upon future developments that cannot be predicted with precision. It is not, however, evidence of, nor even the basis of an inference of, fraud, based upon a clear-eyed assessment of the many careful disclosures and predictions by defendants concerning these developments, as discussed above.

third quarter would end on June 27th. After the quarter ended, the actual result was a 15% increase in sales, as discussed above. To hold that a swing in sales of 2 or 3 percent in an ongoing quarter gives rise to an inference of material misrepresentation, would convert the corporation's attempted communication of uncertainties into a spectacle of corporate self-destruction if the actual performance fell slightly short of the prediction. This two percent shortfall in actual vs. predicted sales is not, as a matter of law and fact, sufficient to support the statement of a claim upon which relief can be granted.

If Shreiber had made the prediction of a 17–18% increase in sales after the end of the quarter on the basis of complete data covering the full quarter, though before the actual third quarter report was released, our decision probably would have been different. In that circumstance, Shreiber's statement concerning 17–18% growth, in the face of complete data showing only 15% growth for the quarter, would have evidenced a statement that was arguably knowingly, or at least recklessly false and misleading. Here, however, Shreiber was speaking before the full quarter's data was in; he was making a prediction of what he thought the quarter's results would be. As the case law makes clear and as we have today recognized, statements of opinion and predictions are actionable in certain circumstances. We conclude, however, that based upon the specific facts of record, this is not such a circumstance.

A corporate official may be held liable if he or she recklessly makes specific predictions about a company's performance if those predictions turn out to have no basis in reality. Shreiber's predictions of June 10, 1992 did have a firm basis in reality. They were off by only 2% when final results were tabulated a month later. Economic prognostication is not an exact science, and predictions are just that—predictions. While we hesitate to

draw a bright-line above which an optimistic statement specifically predicting a company's financial performance figures would be actionable and below which it would not, we think it clear that a difference of 2% between a prediction and the actual results cannot, especially under the circumstances of the case at bar, give rise to an inference of fraud sufficient to defeat this Rule 12(b)(6) motion.[19]

### E. Plaintiffs' Other Claims

#### 1. Section 20(a) of the Securities Exchange Act

■ In addition to alleging violations of § 10(b) and SEC Rule 10(b)(5), the plaintiffs allege that defendants Shreiber and Goldstein are liable as controlling persons of J & J under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). Section 20(a) provides:

> (a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). In light of our finding that there is no merit to the asserted core violations of § 10(b) and Rule 10b–5, it follows that the plaintiffs' allegations of derivative liability under § 20(a) lack merit as well and must be dismissed. *See, e.g., Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 16–17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *VT Investors v. R & D Funding Corp.,* 733 F.Supp. 823, 841 (D.N.J.1990) (citing cases).

---

19. In a letter dated May 5, 1993, plaintiffs have cited us to the Third Circuit's unpublished Opinion in *In re Bell Atlantic Corp.,* 993 F.2d 875. As an unpublished decision, *In re Bell* does not have any precedential value. *See* Internal Operating Procedures of the United States Court of Appeals for the Third Circuit, Chapt. 5, Rules 5.5.1, 5.6. Since the plaintiffs cited it, though, we note here that the Third Circuit stated that it would have affirmed the district court's dismissal of the action "if there had been no prompt application to amend following the district court's opinion[.]" *In re Bell,* slip op. at 11 (993 F.2d 875 [Table]). In the present case, plaintiffs have made no suggestion that a further amendment is desired.

### 2. State Common Law Claims

■ The plaintiffs have also asserted claims under state common law for fraud, deceit, and negligent misrepresentation. Because the plaintiffs' federal securities law claims will be dismissed, this court declines to exercise its supplemental jurisdiction over the plaintiffs' state law claims and will dismiss them as well. *See* 28 U.S.C. § 1367(c)(3) (providing that the district court may decline to exercise supplemental jurisdiction over a state law claim if it has dismissed all claims over which it has original jurisdiction). *See also Lovell Manufacturing v. Export–Import Bank of the United States,* 843 F.2d 725, 734–35 (3d Cir.1988); *VT Investors,* 733 F.Supp. at 843 (concluding that it would be "unnecessary and improvident" to exercise jurisdiction over plaintiffs' state law claims once all of their federal claims were deemed meritless and subject to dismissal) (citations omitted).

### III. *CONCLUSION*

For the reasons discussed herein, the court finds that the plaintiffs have failed to state a claim under the federal securities laws upon which relief can be granted. The court therefore will grant the defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6). The court also declines to exercise supplemental jurisdiction over the plaintiffs' state law claims and will dismiss them for lack of jurisdiction.

An appropriate Order will be entered.

### *ORDER*

This matter having come before the court upon the defendants' motion to dismiss the plaintiffs' Consolidated Amended Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P.; and the court having considered the submissions of the parties; and having heard the arguments of counsel; for the reasons expressed in the Opinion of today's date;

It is this 7th day of July 1993,

ORDERED that defendants' motion is *GRANTED* and that the plaintiffs' Consolidated Amended Complaint be and it hereby is *DISMISSED WITH PREJUDICE* as to plaintiffs' federal securities laws claims; and it is

FURTHER ORDERED that the court declines to exercise supplemental jurisdiction over plaintiffs' state law claims which shall be, and they hereby are, *DISMISSED* for lack of jurisdiction.