**Myron WEINER, Nicholas Sitnycky, Ronald Anderson, and Robert Furman, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**The QUAKER OATS COMPANY and William D. Smithburg, Defendants.**

Civil Action No. 94–5417 (AJL).

United States District Court, D. New Jersey.

May 23, 1996.

Leonard Barrack, M. Richard Komins, Barrack, Rodos & Bacine, Philadelphia, PA, David J. Bershad, Robert A. Wallner, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Gail H. Nichols, Chatham, NJ, for Plaintiffs.

Dennis J. Block, Weil, Gotshal & Manges LLP, New York City, Frederic K. Becker, Wilenz, Goldman & Spitzer, Woodbridge, NJ, for Defendants.

## OPINION

LECHNER, District Judge.

This is a purported class action brought by plaintiffs Myron Weiner ("Weiner"), Nicholas Sitnycky ("Sitnycky"), Ronald Anderson ("Anderson") and Robert Furman ("Furman") on behalf of themselves and all others similarly situated (collectively the "Plaintiffs") against defendants The Quaker Oats Company ("Quaker") and William D. Smithburg ("Smithburg") (collectively the "Defendants") seeking monetary relief for alleged violations of sections 10(b) ("Section 10(b)") and 20(a) ("Section 20(a)") of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated under the 1934 Act. The initial complaint was filed on 10 November 1994 (the "Complaint"); on 20 January 1995 Plaintiffs filed an amended complaint (the "First Amended Complaint"). A second amended class action complaint (the "Second Amended Complaint") was filed on 2 May 1995.

In essence, the allegations of the Second Amended Complaint center around the acquisition of Snapple Beverage Corporation ("Snapple") by Quaker and the statements by Quaker and Smithburg preceding the acquisition.

Jurisdiction is alleged pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331. Venue is alleged pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

Currently before the court is a motion filed by Defendants to dismiss the Second Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedures (the "Motion to Dismiss").[1] For the reasons set forth below, the Motion to Dismiss is granted.

*Facts*

### A. *The Parties*

Weiner, Sitnycky, Anderson and Furman allege they represent a class of people who purchased Quaker common stock during the period 4 August 1994 through and including 1 November 1994 (the "Class Period").[2] Second Amended Complaint, ¶¶ 4, 12. On 22 September 1994, Weiner purchased 300 shares of Quaker common stock at a price of $80⅞ per share and 700 shares at a price of $80⅞ per share. *Id.*, ¶ 7(a). On 23 September 1994, Sitnycky purchased 500 shares of Quaker common stock at a price of $78¾ per share and on 27 September 1994, purchased an additional 2000 shares at a price of $80¼ per share. *Id.*, ¶ 7(b). On 29 September 1994, Anderson purchased 200 shares of Quaker common stock at a price of $78⅛ per share. *Id.*, ¶ 7(c). On 12 October 1994, Furman purchased 1000 shares of Quaker common stock at a price of $77⅛ per share. *Id.*, ¶ 7(d).

Quaker is a corporation incorporated under the laws of the State of New Jersey. *Id.*, ¶¶ 8, 19. Quaker is a worldwide producer of brand name packaged foods; it produces and markets a variety of consumer products including hot and ready-to-eat cereals, break-

---

1. In support of the Motion to Dismiss, Defendants submitted: Notice of Motion to Dismiss Second Amended Class Action Complaint; Memorandum of Law In Support of Defendants' Motion to Dismiss Second Amended Class Action Complaint ("Defendants Brief"); Affidavit of Dennis J. Block In Support of Defendants' Motion to Dismiss Second Amended Class Action Complaint ("Block Aff."), attaching Exhibits A through I; Reply Memorandum In Support of Defendants' Motion to Dismiss Second Amended Class Action Complaint; Supplemental Affidavit of Dennis J. Block In Support of Defendants' Motion to Dismiss Second Amended Class Action Complaint, attaching Exhibits A through C ("Block Supp.Aff."); Defendants' Supplemental Memorandum of Law Submitted In Response to Court's Request and In Support of Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint; Defendants' Supplemental Reply Memorandum of Law

Submitted In Response to Court's Request, In Reply to Plaintiffs' Supplemental Memorandum, and In Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint.

In opposition to the Motion to Dismiss, Plaintiffs submitted: Plaintiffs' Memorandum In Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint (the "Plaintiffs Brief"); Plaintiffs' Memorandum Concerning the Private Securities Litigation Reform Act of 1995; Plaintiffs' Reply Memorandum Concerning the Private Securities Litigation Reform Act of 1995.

2. The Class Period spans a period of time during which the alleged misstatements and omissions by Quaker occurred.

fast syrups, pancake mixes, snack foods, dog and cat foods, and frozen pizzas. *Id.,* ¶ 8. Gatorade thirst quencher is Quaker's largest single product, with sales of the sports drink totaling approximately $1.2 billion annually. *Id.,* ¶¶ 8, 20. In its fiscal year ending 30 June 1994, Quaker had more than $5.9 billion in sales, up about 3.9% from the previous year. *Id.,* ¶ 19. Earnings for 1994, however, fell 19% to $227.5 million, reflecting a restructuring charge for cost reduction activities. *Id.*

Quaker common stock is traded on the New York Stock Exchange. *Id.,* ¶ 18. During the Class Period, the average daily trading volume of Quaker common stock exceeded 560,000 shares. *Id.* Plaintiffs allege the market price during the Class Period reflected all publicly available information concerning Quaker. *Id.*

Smithburg is the Chairman, President and Chief Executive Officer of Quaker. *Id.,* ¶ 9. Plaintiffs allege Smithburg had the power to influence and control Quaker and cause Quaker to engage in a scheme to inflate artificially the market price of its common stock. *Id.,* ¶¶ 10–11. Plaintiffs further allege Smithburg controlled the content of press releases, Security and Exchange Commission ("SEC") filings and other disclosures to securities analysts and the investing public during the Class Period. *Id.,* ¶ 10. Because of his executive, managerial and directoral positions with Quaker, Smithburg was privy to internal corporate memoranda and other information unavailable to the Plaintiffs and other members of the investing public. *Id.*

### B. *Alleged Anti–Takeover Maneuvers*

Plaintiffs allege that prior to Quaker's acquisition of Snapple, there had been speculation Quaker was a candidate for takeover. *Id.,* ¶ 20. Plaintiffs further allege Smithburg and other Quaker officials, in an effort to protect and preserve their own positions, devised a plan intended to thwart any potential hostile acquisition of Quaker. *Id.,* ¶¶ 5–6. Significantly, plaintiffs do not allege, however, that any entity actually attempted or was

attempting to acquire Quaker before or during the Class Period or that any entity actually was deterred from doing so by the Snapple acquisition.

In the spring of 1994, Quaker was in contact with Snapple concerning a possible strategic relationship. *Id.,* ¶ 29. In early August 1994, Quaker advised Snapple it was interested in pursuing an acquisition of Snapple and commenced a due diligence investigation using confidential internal information provided by Snapple. *Id.;* Schedule 14D–1 filed by Quaker 1 November 1994 ("14D–1") at 16 (attached as Exh. A. to Block Supp. Aff.).[3] The Bloomburg Business News quoted Smithburg as stating on 2 November 1994: "[R]ight after some discussions started, it was so obvious that [Snapple] had an interest and we had an interest." Second Amended Complaint, ¶ 29.

### C. *Alleged False and Misleading Statements During the Class Period*

#### 1. *Quaker's Debt/Total Capitalization Ratio*

Quaker has used borrowed capital, termed leverage, to finance its growth in the recent past. *Id.,* ¶ 21. Plaintiffs allege higher leverage increases the risk to equity investors, whose interests are subordinated to those of debt holders. *Id.* In its Annual Report to Shareholders for the fiscal year ending 30 June 1993 (the "1993 Annual Report"), Quaker made the following statement concerning leverage:

*Components of Debt/Total Capitalization Ratio*

One way to measure debt is to compute the ratio of total debt as a percent of total debt plus preferred and common shareholders' equity. Total debt includes both short-term and long-term borrowing. Our debt-to-total capitalization ratio at June 30, 1993 was 59 percent, up from 49 percent in fiscal 1992. Quaker's total debt remained essentially even. Therefore, this increase was primarily due to the decrease in the

---

**3.** A court may consider undisputedly authentic documents a defendant attaches to a motion to dismiss if the plaintiff's claims are based, in part, on those documents. *See infra* Discussion, Part A.

book value of common shareholders' equity which resulted from our share repurchases and the $116 million charge for adopting new accounting principles. *For the future, our guideline for this ratio will be in the upper 60 percent range.*

1993 Annual Report at 32 (emphasis added) (attached as Exh. B to Block Aff.); Second Amended Complaint, ¶ 22.

Smithburg reiterated this total debt-to-total capitalization ratio guideline (the "Leverage Ratio Guideline") in the 1993 Annual Report's Letter to Shareholders, in which he stated:

> [O]ur Board of Directors [has] authorized an increase in our leverage guideline, along with a share repurchase program of up to 5 million shares. *Our guideline for leverage in the future will be to maintain a total debt-to-total capitalization ratio in the upper–60 percent range.*

1993 Annual Report at 35 (emphasis added) (attached as Exh. B to Block Aff.); Second Amended Complaint, ¶ 23. Quaker included a similarly worded statement in its Form 10-Q for the quarter ending 30 September 1993 ("September 1993 10-Q"), filed with the SEC in November 1993. September 1993 10-Q at 9 (attached as Exh. C to Block Aff.); Second Amended Complaint, ¶ 24.

On or about 23 September 1994, Quaker released its Annual Report to Shareholders for fiscal year ending 30 June 1994 (the "1994 Annual Report"). Second Amended Complaint, ¶ 32. The 1994 Annual Report included the following statement: "At the end of fiscal 1994, our total debt-to-total capitalization ratio was 68.8 percent on a book-value basis, *in line with out guideline in the upper 60 percent range.*" 1994 Annual Report at 34 (emphasis added) (attached as Exh. E to Block Aff.); Second Amended Complaint, ¶ 32. Plaintiffs allege the Leverage Ratio Guideline statement remained "alive" in the market uncorrected and unrevised throughout the Class Period. Second Amended Complaint, ¶ 25.

Although all of Quaker's statements termed the Leverage Ratio a "guideline," Plaintiffs allege the 1993 Annual Report, including the Smithburg Letter to Shareholders, the September 1993 10-Q and the 1994 Annual Report established a leverage "ceiling" which the Board of Directors agreed not to exceed. *Id.,* ¶¶ 6, 25. Plaintiffs further allege Quaker knew it was planning to exceed the Leverage Ratio Guideline by taking on additional debt to finance the acquisition of Snapple. *Id.,* ¶ 25.

### 2. *Earnings Growth*

On 4 August 1994, Quaker announced its financial results for both the fourth quarter of fiscal 1994 and for fiscal 1994. *Id.,* ¶ 26. Sales had increased to $1.618 billion, up from $1.545 billion, but due to major cost-reduction measures, net income dropped from $93.4 million to $23.5 million. *Id.,* ¶ 26. In connection with the announcement of its fiscal 1994 results, Quaker held a meeting for financial reporters and securities analysts. *Id.,* ¶ 27.

Plaintiffs allege Smithburg commented about the fiscal 1994 results and future strategies. *Id.* A Dow Jones News Wire report quoted Smithburg as stating, he was " 'confident' of achieving at least 7% real earnings growth" in fiscal 1995 (the "Earnings Growth Target"). 4 August 1994 Dow Jones News Wire (attached as Exh. D to Block Aff.); Second Amended Complaint, ¶ 27. The Earnings Growth Target was reiterated in the 1994 Annual Report which stated: "[W]e are committed to achieving a real earnings growth of at least 7 percent over time." 1994 Annual Report at 33 (attached as Exh. E to Block Aff.); Second Amended Complaint, ¶ 33. Plaintiffs, however, curiously exclude a significant portion of the Dow Jones News Wire report from the Second Amended Complaint. At the same meeting where Smithburg relayed his confidence in achieving at least seven percent real earnings growth in fiscal 1995, he also stated that Quaker had missed "its 7% target" in fiscal 1994. 4 August 1994 Dow Jones News Wire (attached as Exh. D. to Block Aff.).

### 3. *Alleged False and Misleading Nature of the Leverage Ratio Guideline and Earnings Growth Target*

Plaintiffs allege Quaker was, by early August 1994, involved in negotiations to acquire

Snapple and these negotiations had reached a point where it was "highly probable" that the acquisition would be consummated. Second Amended Complaint, ¶ 28. Plaintiffs allege Defendants knew or recklessly disregarded that the acquisition of Snapple would cause Quaker to borrow money and incur amortization and depreciation expenses. *Id.,* ¶¶ 30–31. Under Plaintiffs alleged scenario, Defendants knew or recklessly disregarded that to acquire Snapple, Quaker would need to borrow "substantial" funds. *Id.,* ¶ 31. This additional debt would cause Quaker to exceed its Leverage Ratio Guideline. *Id.* Plaintiffs contend that as of early August 1994, Defendants had a duty to disclose information concerning the acquisition and its impact on the Leverage Ratio Guideline. *Id.*

Plaintiffs further allege, Defendants knew or recklessly disregarded that Quaker's earnings would be diluted "by a substantial amount" for many years beginning in fiscal 1995 because the acquisition of Snapple would cause Quaker to incur amortization and depreciation expenses. *Id.,* ¶ 30. Plaintiffs contend the statements about the Earnings Growth Target were therefore made without a reasonable basis and were "materially overstated" because Smithburg possessed knowledge of Quaker's plan to implement an anti-takeover strategy which included the acquisition of Snapple. *Id.,* ¶¶ 28, 30. Plaintiffs contend Defendants, with knowledge of the impending Snapple acquisition, could not reasonably expect to achieve seven percent real earnings growth in 1995. *Id.,* ¶ 30.

Notwithstanding the above-described allegations, the Second Amended Complaint does not allege the Quaker Board of Directors, before it approved the Snapple acquisition, agreed to pursue any transaction to cause Quaker to exceed its Leverage Ratio Guideline. As explained, once the acquisition was approved, Quaker and Snapple issued a press release announcing that Quaker would acquire Snapple in a tender offer and merger transaction for $1.7 billion in cash (the "November Press Release").

### D. *Snapple Acquisition*

In late September 1994, Quaker informed Snapple that it remained interested in a po-tential acquisition but it needed additional information to complete its due diligence investigation. 14D–1 at 16 (attached as Exh. A to Block Supp.Aff.). Quaker also informed Snapple that its interest in an acquisition "was dependent on the majority stockholders of [Snapple] contractually committing to any negotiated transaction." *Id.* Snapple agreed to provide additional information for the due diligence investigation. *Id.*

After continued negotiations, a draft Merger Agreement and Stockholders Agreement were delivered to Snapple on 24 October 1994. *Id.* Negotiation meetings continued until 1 November 1994. *Id.* at 16–17. Between 30 October 1994 and 1 November 1994, a financing commitment was negotiated and finalized. *Id.* at 17. In the evening of 1 November 1994, the Boards of Directors of Quaker and Snapple independently met and approved the transaction. *Id.*

On 2 November 1994, Quaker and Snapple issued the November Press Release. *Id.,* ¶ 34. To finance the acquisition, Quaker obtained a $2.4 billion revolving credit from a banking group led by NationsBank Corp. *Id.,* ¶ 35. The Snapple acquisition doubled Quaker's debt. *Id.* The price of Quaker common stock dropped $7.375 per share on the day of the announcement. *Id.,* ¶ 34.

On 12 January 1995, Quaker announced its December 1994 purchase of Snapple would reduce Quaker's fiscal second quarter earnings by twenty to twenty-five percent from a year earlier. *Id.,* ¶ 38. Quaker stated expenses related to the Snapple acquisition amounted to six cents to eight cents a share. *Id.* Plaintiffs allege the Snapple acquisition will dilute Quaker's earnings by $.45 to $.50 a share in fiscal 1996. *Id.,* ¶ 36. Plaintiffs contend the acquisition accomplished Defendants' goal of warding off potential acquirors from considering a takeover of Quaker. *See id.,* ¶ 35.

### E. *Procedural History*

On 10 November 1994, Plaintiffs filed the Complaint and a status conference was held on 10 January 1995 (the "January Status Conference"). At the January Status Con-

ference, counsel for Defendants indicated they would file a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. January Status Conference Tr. at 4. At the January Status Conference, it was explained that before filing the motion to dismiss, counsel for Defendants should first "write a letter to the plaintiffs ... [to] fairly apprise them of what the shortcomings of the Complaint may be." *Id.* at 5–6. After receiving this information from Defendants, Plaintiffs then could choose to amend the Complaint. *Id.* at 6. Plaintiffs were informed that they could amend the Complaint only once and they would not be permitted a second opportunity to amend. *Id.* at 16. Counsel for both parties assented to this procedure. *Id.*

Subsequently at the January Status Conference, counsel for Defendants were permitted to inform Plaintiffs orally of the perceived shortcomings in the Complaint. *Id.* Counsel for Defendants stated:

> [T]he gravamen of the complaint is that Quaker, in order to evade a potential takeover of itself, engaged secretly in negotiations to acquire another company, thus making it more difficult to acquire. The specific allegation is that Quaker failed to disclose in its SEC reports and public statements that it was negotiating, a defensive acquisition to avoid possible takeover itself. Those are the facts. The law in this area as decided by the Supreme Court of the United States in the [*Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)] case is that absent duty, no disclosure need be made. And the [C]ourt said merger negotiations in and of themselves create no duty to disclose. That is the basis of my motion, your Honor.

*Id.* at 16–17. Therefore, on 20 January 1995, Plaintiffs filed the First Amended Complaint.[4]

On 13 March 1995, pursuant to Rule 12N, *Appendix N* of the General Rules Governing the United States District Court for the District of New Jersey, the Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

On 25 April 1995, rather than dismiss the First Amended Complaint, Plaintiffs were permitted a second opportunity to amend and conform their allegations to Defendants' dismissal arguments. The original motion was denied without prejudice. Plaintiffs filed the Second Amended Complaint on 2 May 1995. Defendants refiled the Motion to Dismiss and completed supplemental briefing after enactment of the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737 (22 Dec. 1995). Plaintiffs have not sought a third opportunity to amend.

Plaintiffs allege Defendants participated in the complained of acts and omissions in order to (1) artificially inflate and maintain the market price of Quaker common stock during the Class Period and thereby cause Plaintiffs to purchase the common stock at artificially inflated prices, (2) protect, perpetuate and enhance the executive positions and the substantial compensation, prestige and other perquisites of executive employment enjoyed by Smithburg and others and (3) discourage other companies from attempting to takeover Quaker by maintaining an artificially high market price for Quaker stock. Second Amended Complaint, ¶ 11. Plaintiffs claim Defendants actions violate Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5.

Defendants contend that Plaintiffs allegations, at most, attack the business judgment underlying the Snapple acquisition and fail to state a Federal securities claim. Defendants Brief at 2. Defendants argue they had no duty to disclose any facts regarding the acquisition prior to the November Press Release because there is no general duty under Federal securities law to disclose details concerning on-going merger discussions. *Id.* at 3. Defendants assert an affirmative duty to disclose on-going merger discussions exists in limited circumstances, but Plaintiffs failed to plead sufficient facts giving rise to such a duty. *Id.* Defendants further contend the

---

4. By Order, filed 17 January 1995, the instant action was consolidated with *Anderson v. Quaker Oats,* Civil Action No. 94–5418, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

public statements challenged by Plaintiffs were not rendered inaccurate or incomplete by non-disclosure of the Snapple acquisition discussions. *Id.*

A thorough review of the Second Amended Complaint reveals that even with two rounds of amendments, Plaintiffs failed to remedy the original deficiencies. Plaintiffs' claims are dismissed for failure to state a claim upon which relief can be granted.

### Discussion

#### A. Consideration of Facts Derived From Documents Other Than the Second Amended Complaint

■ For purposes of the Motion to Dismiss, Defendants accept as true the factual allegations in the Second Amended Complaint. *See* Defendants Brief at 4 n. 3. Additional facts are derived from the 14D–1 and other documents filed with the SEC. A court may consider undisputedly authentic documents a defendant attaches to a motion to dismiss if the plaintiff's claims are based on those documents.[5] *Dykes v. Southeastern Pa. Transp. Auth.,* 68 F.3d 1564, 1567 n. 3 (3d Cir.1995); *In re Donald J. Trump Casino Sec. Litig.–Taj Mahal Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).

■ Documents a court may consider include those specifically referred to in a complaint or other public records on which the claim is based, such as letter decisions of public agencies. *Pension Benefit,* 998 F.2d at 1197. If a court could not consider such documents, "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Dykes,* 68 F.3d at 1567 n. 3. Because Plaintiffs' claims are based, in part, on the 14D–1 and other publicly filed documents such as the 1993 and 1994 Annual Reports, they may be considered without converting the Motion to Dismiss into a summary judgment motion.

■ A court can refer to documents on which a complaint is based without converting a Rule 12(b)(6) motion into one for summary judgment because "reference to the full text is necessary to place the defendants' [actions] cited by plaintiffs in their … [c]omplaint into the proper context." *Renz v. Shreiber,* 832 F.Supp. 766, 771 (D.N.J.1993). This is consistent with Rule 12(b)(6) because " '[w]hen a complaint relies on a document … the plaintiff obviously is on notice of the contents of the document and the need for a chance to refute evidence is greatly diminished.' " *Dykes,* 68 F.3d at 1567 n. 3 (quoting *Pension Benefit,* 998 F.2d at 1196–97). In the Second Amended Complaint, Plaintiffs rely on various public documents including the 14D–1. *See* Second Amended Complaint, ¶ 43(a). Consideration of the 14D–1 is appropriate because it puts Quaker's alleged conduct into a proper context. *See, e.g., Renz,* 832 F.Supp. at 771.

#### B. Standard For Dismissal Under Rule 12(b)(6)

■ When considering a motion to dismiss, all allegations in the complaint must be

---

5. Plaintiffs filed a motion to strike certain portions of the Block Supp.Aff. (the "Motion to Strike"). In support of the Motion to Strike, Plaintiffs submitted: Notice of Motion to Strike; Plaintiffs' Memorandum In Support of Their Motion to Strike Portions of the Supplemental Affidavit of Dennis J. Block; Plaintiffs' Reply Memorandum In Support of Their Motion to Strike Portions of the Supplemental Affidavit of Dennis J. Block. In opposition to the Motion to Strike, Defendants submitted: Defendants' Answering Brief In Opposition to Plaintiffs' Motion to Strike Portions of the Supplemental Affidavit of Dennis J. Block.

Plaintiffs seek to strike two exhibits attached to the Block Supp.Aff., Exhibits A and B. Exhibit A is Quaker's Schedule 14D–1 and Exhibit B is Snapple's Schedule 14D–9; both documents were filed with the SEC on 1 November 1994. Because the portions of the 14D–1 and 14D–9 cited by Defendants contain identical information and to minimize the time expended on this wasteful motion, only use of the 14D–1 will be discussed. The Motion to Strike is deemed moot as to Exhibit B.

The Second Amended Complaint refers to and relies on the 14D–1 to establish fraud. Second Amended Complaint, ¶ 43(a). For the reasons set forth in this opinion, the Motion to Strike is denied as to Exhibit A.

accepted as true and all reasonable factual inferences drawn in the plaintiff's favor. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989); *Gomez v. Toledo,* 446 U.S. 635, 636 n. 3, 100 S.Ct. 1920, 1921–22 n. 3, 64 L.Ed.2d 572 (1980); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994); *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir. 1991); *Borough of Sayreville v. Union Carbide Corp.,* 923 F.Supp. 671, 675–76 (D.N.J. 1996); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 919 F.Supp. 756, 758–59 (D.N.J.1996); *Sim Kar Lighting Fixture Co. v. Genlyte, Inc.,* 906 F.Supp. 967, 970 (D.N.J.1995); *Bermingham v. Sony Corp. of Am., Inc.,* 820 F.Supp. 834, 846 (D.N.J.1992), *aff'd,* 37 F.3d 1485 (3d Cir. 1994). Nevertheless, legal conclusions made in the guise of factual allegations are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944–45, 92 L.Ed.2d 209 (1986); *Borough of Sayreville,* 923 F.Supp. at 675–76; *Bermingham,* 820 F.Supp. at 846; *see also Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt,* 643 F.2d 618, 626 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

■ A Federal court reviewing the sufficiency of a complaint has a limited role. A court may dismiss a complaint for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Piecknick,* 36 F.3d at 1255; *ALA,* 29 F.3d at 859; *Jordan,* 20 F.3d at 1261; *College Sav. Bank,* 919 F.Supp. at 758–59. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Estate of Bailey v. County of York,* 768 F.2d 503, 506 (3d Cir.1985); *College Sav. Bank,* 919 F.Supp. at 758–59; *Bermingham,* 820 F.Supp. at 846. Rule 12(b)(6) does not, however, sanction "dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1832; *Zucker v. Quasha,* 891 F.Supp. 1010, 1013 (D.N.J.1995).

### C. Standard for Claims Brought Under the 1934 Act

■ Under the authority provided by Section 10(b) of the 1934 Act,[6] the SEC promulgated Rule 10b–5,[7] which makes it unlawful to misrepresent or omit material information in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b–5. To state a securities fraud claim under Section 10(b) and Rule 10b–5, a private plaintiff must plead (1) a false representation or omission of (2) a

---

**6.** Section 10(b) provides, in pertinent part:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

 \* \* \* \* \* \*

 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. § 78j(b).

**7.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 17 C.F.R. § 240.10b–5.

material (3) fact, (4) the defendant's knowledge or reckless disregard of its falsity and his or her intention that the plaintiff rely on it, (5) the plaintiff's reasonable reliance thereon, and (6) that the plaintiff's reliance was the proximate cause of his or her injury. *Kline v. First Western Gov't Sec., Inc.,* 24 F.3d 480, 487 (3d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 280 (3d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Lewis v. Chrysler Corp.,* 949 F.2d 644, 649 (3d Cir.1991); *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989); *Zlotnick v. TIE Communications,* 836 F.2d 818, 821 (3d Cir. 1988); *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986); *Cammer v. Bloom,* 711 F.Supp. 1264, 1276 (D.N.J.1989), *appeal dismissed,* 993 F.2d 875 (3d Cir.1993) (table). Defendants assert Plaintiffs have not pleaded facts that rise to a violation of Section 10(b) and Rule 10b–5.

### D. *General Duty to Disclose Potential Acquisitions*

■ When an allegation of fraud under Section 10(b) and Rule 10b–5 is based on a nondisclosure, as opposed to affirmative misrepresentation, there can be no finding of fraud absent a duty to speak. *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1418 (3d Cir.1993) (citing *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980)). "A duty to disclose under Section 10(b) does not arise from the mere possession of nonpublic market information." *Chiarella,* 445 U.S. at 235, 100 S.Ct. at 1118. Indeed, " '[a]bsent a specific duty to disclose, even the most material information imaginable may be withheld from the public.' " *Slemrod v. Yardley Sav. and Loan Ass'n,* 1990 WL 158620, at * 4 (E.D.Pa.1990) (quoting *Polak v. Continental Hosts, Ltd.,* 613 F.Supp. 153, 155–56 (S.D.N.Y.1985)).

Plaintiffs concede there is no general duty to disclose any information about negotiations regarding a potential acquisition or other extraordinary corporate transaction. Plaintiffs Brief at 11; *see Basic, Inc. v. Levinson,* 485 U.S. 224, 234, 238–41, 108 S.Ct. 978, 984–85, 986–89, 99 L.Ed.2d 194 (1988)

(the acquiror must often keep negotiations concerning an acquisition confidential "to avoid a 'bidding war' over the target"); *see, e.g., Glazer v. Formica Corp.,* 964 F.2d 149, 155–57 (2d Cir.1992) ("[w]e agree that the mere fact that exploration of merger or LBO possibilities may have reached a stage where that information may be considered material does not, of itself, mean that the companies have a duty to disclose"); *Taylor v. First Union Corp.,* 857 F.2d 240, 243 (4th Cir.1988) (defendants "were under no obligation to disclose ... discussions of the possibility of a future merger"), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989); *Holstein v. Armstrong,* 751 F.Supp. 746, 747–48 (N.D.Ill.1990) (defendants under no duty to disclose receipt of takeover proposal; motion to dismiss granted); *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1128–29 (D.Del.1988) (corporation did not have a duty to disclose negotiations concerning sale of subsidiary; motion to dismiss non-disclosure claim granted).

■ A corporation, however, has an affirmative duty to disclose information concerning a potential acquisition or other extraordinary corporate transaction in certain circumstances. For example, a corporation would have to disclose all material information concerning a potential acquisition if a partial disclosure of information was made or if the corporation publicly denied the existence of merger negotiations. *See, e.g., Basic,* 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17; *Glazer,* 964 F.2d at 157; *Taylor,* 857 F.2d at 243; *In re General Motors,* 694 F.Supp. at 1129. Partial disclosure of material information can give rise to a duty to make full disclosure. *See Jaroslawicz v. Engelhard Corp.,* 704 F.Supp. 1296, 1299 (D.N.J.1989); *Slemrod,* 1990 WL 158620, at * 4. " 'Silence ... is proscribed ... [when] the defendant has revealed some relevant, material information even though he [or she] had no duty (*i.e.,* a defendant may not deal in half truths).' " *Slemrod,* 1990 WL 158620, at * 4 (quoting *First Va. Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978)).

■ Absent a duty to disclose, "silence ... is not misleading under Rule 10b–5." *Basic,* 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17. In *Basic,* the Court held the materiality of statements regarding acquisition negotiations often depends on the facts of each case. 485 U.S. at 239, 108 S.Ct. at 987. The Court's holding leaves open the possibility a party's statements concerning acquisition negotiations could be considered material. As a result of *Basic,* a terse "no comment" statement may well be the safest statement for any entity involved in acquisition negotiations. *See id.* at 239 n. 17, 108 S.Ct. at 988 n. 17.

■ The Second Amended Complaint does not allege the Defendants made any public statement concerning the Snapple Acquisition before the November Press Release. The Second Amended Complaint does not allege the Defendants were trading in Quaker stock during the Class Period. Plaintiffs argue, however, Defendants had a duty to disclose part of the acquisition negotiations to inform stockholders Quaker would exceed the Leverage Ratio Guideline and not achieve the Earnings Growth Target. *See* Plaintiffs Brief at 12.

Disclosure concerning the Leverage Ratio Guideline and Earnings Growth Target, which Plaintiffs assert Defendants had a duty to make, relates solely to Quaker's acquisition of Snapple and is indistinguishable from a disclosure concerning the potential acquisition negotiations. To require Quaker to disclose the possibility it might seek loans to finance an acquisition is tantamount to requiring the disclosure of the acquisition negotiations.

If Quaker disclosed partial information about the acquisition negotiations, it would have to disclose all material information about the potential acquisition. *See Basic,* 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17; *Glazer,* 964 F.2d at 157; *Taylor,* 857 F.2d at 243; *In re General Motors,* 694 F.Supp. at 1129. Premature release of this information might have had an impact on the market and the price of Snapple stock; in turn the acquisition may have been more costly or unsuccessful. If the acquisition negotiations collapsed after disclosure, however, the value of

Quaker common stock might have been affected. The latter development may have led stockholders to sue Quaker for making premature statements concerning the potential acquisition. Such suits are not uncommon. *See, e.g., In re Fischbach Corp. Sec. Litig.,* 1992 Fed.Sec.L.Rep. (CCH) ¶ 98,665, 1992 WL 8715 (S.D.N.Y. 15 Jan. 1992) (stockholders initiated an action for violations of Section 10(b) and Rule 10b–5 alleging the company was reckless in announcing an anticipated merger agreement before fully researching the financial viability of the target).

In these circumstances, to hold Defendants had a duty to disclose the potential acquisition is unreasonable. As discussed, if Quaker had disclosed the potential acquisition too early in the process, it may have been sued for securities fraud. If Quaker had disclosed only partial information about the potential acquisition, it may have been sued for securities fraud. And when Quaker remained silent and did not disclose any information about the potential acquisition, it was sued for securities fraud. With the acceptance of Plaintiffs' argument, the result would be that a company in Quaker's position could not enter into any discussions about a potential acquisition without facing potential liability for securities fraud. Defendants were under no general duty to disclose the negotiations or the possible acquisition during the Class Period.

### E. Materiality of Previously Disclosed Statements

■ A corporation is under a duty to disclose "any material facts that are necessary to make disclosed material statements ... not misleading." *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 641 (3d Cir.1989); *see also In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). Plaintiffs contend the Leverage Ratio Guideline and Earnings Growth Target are material facts that became misleading once the Snapple acquisition appeared "probable." Plaintiffs Brief at 18–21. Plaintiffs argue Defendants should have disclosed the acquisition negotiations, or at least, disclosed

the financial aspects of the potential acquisition. *Id.* at 20–21. Before any duty to update a statement arises, a material statement must first have been made and subsequently rendered misleading by intervening factors. *See Craftmatic*, 890 F.2d at 641.

 "Information is material if there is a substantial likelihood that, under all the circumstances, the information would have assumed 'actual significance in the deliberations of the reasonable shareholders.'" *Lewis*, 949 F.2d at 649 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *Basic*, 485 U.S. at 231–32, 108 S.Ct. at 983–84 (expressly adopting the materiality standard of *TSC Indus.* for use in Section 10(b) and Rule 10b–5 cases). The Supreme Court has been "careful not to set too low a standard of materiality" in order to avoid "an overabundance of information" especially concerning corporate developments of "dubious significance." *Lewis*, 949 F.2d at 649 (quoting *Basic*, 485 U.S. at 231, 108 S.Ct. at 983). It is not enough that a statement is false or incomplete; if the misrepresented fact is not material, then the misrepresented fact is not actionable. *Basic*, 485 U.S. at 238, 108 S.Ct. at 986–87.

 Omitted information is material if there is a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic*, 485 U.S. at 231–32, 108 S.Ct. at 983 (quoting *TSC*

*Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132); *accord Craftmatic*, 890 F.2d at 639. When the impact of a corporate development is "contingent and speculative in nature"[8] it may be "difficult to ascertain whether the 'reasonable investor' would have considered ... omitted information significant at the time." *Basic*, 485 U.S. at 232, 108 S.Ct. at 984.

While "'[t]he task of determining whether a given omission is material is especially difficult when the plaintiff alleges nondisclosure of soft information ... such as opinions, motives, intentions, or forward looking statements, such as projections, estimates and forecasts,'" a court can, as a matter of law, conclude an estimate of an action's cost to shareholders is not material for Section 10(b) and Rule 10b–5 purposes. *Lewis*, 949 F.2d at 652 (quoting *Craftmatic*, 890 F.2d at 642). Materiality is appropriately resolved as a matter of law when reasonable minds cannot differ as to the materiality or immateriality of the omissions. *TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2132–33; *Craftmatic*, 890 F.2d at 641.

### 1. The Leverage Ratio Guideline

 Plaintiffs contend a reasonable investor would understand the Leverage Ratio Guideline as establishing a ceiling on total debt-to-total capitalization. Plaintiffs Brief at 14–15. Plaintiffs argue nondisclosure of the potential acquisition rendered the Leverage Ratio Guideline misleading. *Id.* at 18–21. Every statement concerning the Lever-

---

**8.** Any prediction concerning cost to shareholders that would be speculative and unreliable is immaterial as a matter of law and the failure to make such a prediction cannot be the basis for finding a securities fraud violation. *Lewis*, 949 F.2d at 653; *Craftmatic*, 890 F.2d at 644. For example, in *Lewis*, the Third Circuit stated:

> Pre-planned defensive strategies like the [Shareholder Rights] Plan "are inherently contingent in nature." It follows that estimates of the amended Plan's financial effects on shareholder wealth would be wholly speculative and depend upon the Plan's actual operation in the context of some as yet undeveloped future attempt to acquire control of Chrysler in the face of the Plan. Understandably, Chrysler management never talked publicly about the amendments' future financial impact on shareholder wealth.

949 F.2d at 653. "'The line between a material nondisclosure and the nondisclosure of mere mismanagement is often difficult to draw.'" *Id.* at 649 (quoting *Craftmatic*, 890 F.2d at 639). The difference is significant because "the fairness of the terms of [a] transaction is beyond the scope of the [1934] Act.... [A] breach of fiduciary duty, unaccompanied by misrepresentation, nondisclosure, or deception, does not violate the statute or the Rule." *Id.* (quoting *Craftmatic*, 890 F.2d at 638); *see Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (acts of corporate mismanagement do not violate Section 10(b) or Rule 10b–5 in the absence of a material deception, misrepresentation, or failure to disclose).

age Ratio Guideline, however, indicated it was a desired "guideline"; a guideline does not constitute the type of "express statement of intent" that must be corrected if circumstances subsequently change. *See In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1245 (3d Cir.1989). A corporation is under no obligation to disclose "every piece of information in its possession that could affect the price of its stock." *Time Warner*, 9 F.3d at 268.

The Leverage Ratio Guideline challenged by Plaintiffs stands in contrast to those cases where a defendant made statements which directly contradicted and were entirely inconsistent with the allegedly omitted material facts. For example, in *Phillips*, the Mesa Partnership ("Mesa") issued a press release stating that it was commencing a tender offer for 15 million shares of Phillips Petroleum Company ("Phillips") common stock. *Id.* at 1239. The press release also stated that Mesa would "not sell any Phillips shares owned by it back to Phillips except on an equal basis with all shareholders." *Id.* In the Schedule 13–D filed with the SEC, Mesa reiterated its intention to not sell shares back to Phillips except on an equal basis with all shareholders. *Id.* This statement was again reaffirmed by a Mesa spokesperson during a televised interview. *Id.* During subsequent negotiations between Mesa and Phillips, Mesa revised its Schedule 13–D eight times. *Id.* None of the amendments changed Mesa's original statement that it would not sell shares back to Phillips except on an equal basis with all shareholders. *Id.* at 1240.

Less than three weeks after Mesa's initial statement regarding its intention with respect to Phillips stock, Mesa and Phillips reached an agreement "in which all shareholders were *not* treated on an equal basis." *Id.* at 1241 (emphasis added). This was antithetical to the clear and absolute statement previously made. This Circuit held that Mesa's actions were reckless, satisfying the scienter requirement for a violation of Section 10(b) and Rule 10b–5. "A jury could ... reasonably find making the statements to be an extreme departure from the standards of ordinary care." *Id.* at 1247.

Likewise, in *Time Warner*, the corporation announced a plan to forge "strategic alliances" to infuse itself with billions of dollars in capital in an effort to overcome over $10 billion in debt. 9 F.3d at 262. The corporation was also considering a new stock offering to reduce its debt; consideration of the stock offering, however, was not announced. *Id.* at 262.

The Second Circuit held that defendants' public statements regarding strategic alliances lacked the sort of definitive positive projections that would require later correction. *Id.* ("[t]he statements suggest only the hope of [the] company ... that the talks would go well. No identified defendant stated that he thought deals would be struck by a certain date, or even that it was likely that deals would be struck at all"). *Id.*

The corporation's failure to disclose its consideration of a stock offering, however, was viewed differently. The court held Time Warner "may have come under a duty to disclose" because the stock offering would place the corporation's statements regarding strategic alliances in a different light. *Id.* at 268. The court was careful to limit its holding:

> [W]e hold that when a corporation is pursuing a *specific* goal and announces that goal *as well as an intended approach for reaching it*, it may come under an obligation to disclose other approaches to reaching the goal when *those approaches are under active and serious consideration*.

*Id.* (emphases added).

Quaker's comments regarding the Leverage Ratio Guideline are not analogous to the statements held actionable in *Phillips* or in *Time Warner*. Unlike the statements found to be misrepresentations in *Phillips* and *Time Warner*, Quaker never announced an express statement of intent; nor did it announce an "intended approach" for maintaining the Leverage Ratio Guideline in the upper sixty percent range.

Quaker's 1994 Annual Report states Quaker had recently acquired four companies and

debt had increased significantly.[9] 1994 Annual Report at 35, 42 (attached as Exh. E to Block Aff.). A reasonable investor, therefore, was on notice that acquisitions and increasing debt were to be expected in the future. *See id.* No reasonable investor could interpret the Leverage Ratio Guideline as an absolute restriction on Quaker's ability to take advantage of a corporate opportunity which might cause Quaker to exceed the Leverage Ratio Guideline. If Quaker wanted to set an absolute ceiling rather than a guideline, it would have done so; it did not.[10]

### 2. Earnings Growth Target

■■■■ Projections and statements of optimism held to be material are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made. *In re Trump Casino Sec. Litig.,* 7 F.3d at 371; *Herskowitz v. Nutri/System, Inc.,* 857 F.2d 179 (3d Cir.1988) (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985)), *cert. denied,* 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989). Management projections of profit and growth can have a reasonable basis if there is a history of profitable operations. *Craftmatic,* 890 F.2d at 642 n. 19; *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1279 (D.C.Cir. 1994) ("history of successful operations ... may provide management with a reasonable basis for predictions of similar prospects in the future"); *Renz,* 832 F.Supp. at 777–78 (" 'a reasoned and justified statement of opinion, one with a sound factual or historical basis, is not actionable' ") (quoting *Eisenberg,* 766 F.2d at 776); *accord Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995).

The 1994 Annual Report expressly states that in the past "earnings per share increased 9 percent per year on average" in real terms for five consecutive years. 1994 Annual Report at 33 (attached as Exh. E to Block Aff.). This history of successful performance—achieved during a period when Quaker was pursuing a strategy of using leverage to finance growth by acquisition—fatally undermines any inference that Quaker's optimistic Earnings Growth Target lacked a reasonable basis when made. *See, e.g., Kowal,* 16 F.3d at 1279; *Herskowitz,* 857 F.2d at 184; *Eisenberg,* 766 F.2d at 776. Plaintiffs, therefore, have failed to state a claim that the Earnings Growth Target lacked a reasonable basis when made or even once the Snapple acquisition was announced.[11]

Accordingly, the Second Amended Complaint fails to state a claim upon which relief can be granted. No allegation supports the contention that Quaker or Smithburg misrepresented a material fact or had a duty to disclose any aspect of the Snapple acquisition negotiations prior to the November Press Release. When no duty to disclose exists, there can be no finding of securities fraud.

**9.** The leverage ratio went from forty-nine percent in 1992 to 59 percent in 1993. 1993 Annual Report at 35 (attached as Exh. B to Block Aff.). The leverage ratio had increased to 63.5 percent by 30 September 1993. September 1993 10–Q at 9 (attached as Exh. C to Block Aff.). By the end of fiscal 1994, the ratio had increased to 68.8 percent. 1994 Annual Report at 33–34 (attached as Exh. E to Block Aff.).

**10.** A plaintiff's proffered interpretation of language in publicly available corporate documents may be rejected as a matter of law where, as here, such interpretation is not supported by the actual language in the documents. *See, e.g., In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1419 (9th Cir.1994) (dismissing claims where "the only reasonable reading" of the prospectus alleged to be false and misleading "did not imply" that which plaintiffs said it implied); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (dismissing claims predicated on an unreasonable interpretation of language).

**11.** Even though Defendants had a reasonable basis for the Earnings Growth Target, this type of statement is immaterial as a matter of law because financial projections and generalized statements of optimism are not guarantees of future performance justifying reliance by a reasonable investor. *See, e.g., Shapiro,* 964 F.2d at 283 n. 12 (statement that bank "looks to the future with great optimism" is "clearly inactionable puffing"); *see also Kowal,* 16 F.3d at 1276 ("[f]inancial projections and generalized statements of optimism ... are not guarantees of future financial performance, nor are they understood as such by reasonable investors"); *In re American Travellers Corp. Sec. Litig.,* 806 F.Supp. 547, 552 n. 2 (E.D.Pa.1992) ("expressions of general optimism constitute unactionable 'puffing' ").

Plaintiffs' Section 10(b) and Rule 10b–5 claims are dismissed.

### F. Anti–Takeover Maneuvers

 Quaker is, furthermore, under no duty to disclose how the acquisition of Snapple benefitted management. Quaker's failure to disclose how management might utilize an acquisition to their own advantage

> "is not an actionable omission of material fact because the investing public is charged with 'knowledge of information of which they reasonably should be aware,' which includes 'the universal interest of corporate officers and directors in maintaining corporate control.'"

*Lewis,* 949 F.2d at 651 (quoting *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1492 (D.Del.1984)).

The claim that Quaker was obligated to disclose the Snapple acquisition benefitted management is, in effect, a claim that Quaker misrepresented the Leverage Ratio Guideline and Earnings Growth Target as part of its entrenchment scheme. Even if management motives in acquiring Snapple were self-serving as alleged, Quaker's "failure to disclose management's entrenchment scheme is not actionable under the [F]ederal securities laws." *Lewis,* 949 F.2d at 651. "'[C]orporate officers and directors do not violate the [F]ederal securities laws by failing to disclose an entrenchment motive or scheme underlying their actions.'" *Id.* (quoting *Warner Communications,* 581 F.Supp. at 1490). Indeed, "'the decision to resist a takeover is within the scope of directors' state law fiduciary duties, and there is no [F]ederal securities law duty to disclose one's motives in undertaking such resistance.'" *Id.* at 652 (quoting *Panter v. Marshall Field & Co.,* 646 F.2d 271, 290 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981)).

### G. Controlling Person Liability

Plaintiffs contend that, in addition to his liability for primary violations under Section 10(b) of the 1934 Act, Smithburg is also secondarily liable as a controlling person of Quaker under Section 20 of the 1934 Act, 15 U.S.C. § 78t(a).[12] To establish controlling person liability against Smithburg there must first be primary liability on the part of Quaker.

"[O]nce all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based." *Shapiro,* 964 F.2d at 279; *VT Investors v. R & D Funding Corp.,* 733 F.Supp. 823, 841 (D.N.J. 1990) (controlling person claims must be dismissed as a matter of law when the underlying core allegations are dismissed). Accordingly, because the Section 10(b) and Rule 10b–5 claims are dismissed, the controlling person claim under Section 20 is also dismissed.

### H. Private Securities Litigation Reform Act of 1995

In December 1995, Congress enacted the Private Securities Litigation Reform Act (the "Reform Act"), Pub.L. No. 104–67, 109 Stat. 737 (22 Dec. 1995), "to protect investors, issuers, and all who are associated with our capital markets from abusive securities litigation" and to "implement[ ] need[ed] procedural protections to discourage frivolous litigation." H.R.Conf.Rep. 104–369, 104th Cong., 1st Sess. 31, 32 (1995).[13] The Reform Act specifically targets abusive practices including "the routine filing of lawsuits ... with only the faint hope that the discovery

---

**12.** Section 20 provides, in pertinent part:

> (a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

**13.** The Reform Act does not apply to this action. *Id.* at 23 ("amendments made by this title shall not affect or apply to any private action arising under [the 1934 Act] ... commenced before and pending on the date of enactment of this Act"). It is only discussed to emphasize Congressional intent to minimize wasteful litigation, such as this action, brought under Section 10(b) and Rule 10b–5.

process might lead eventually to some plausible cause of action." *Id.* at 31.

The Reform Act provides a "safe harbor" for forward-looking statements such as projections of revenue, earnings per share, capital expenditures, dividends, capital structure and statements of management's plans and objectives for future operations or future economic performance. *See* Sections 21E(c) and 21E(i)(1) of the 1934 Act, 15 U.S.C. §§ 78u–5(c) and 78u–5(i)(1). This safe harbor applies to any statement that is (1) identified as a forward-looking statement and accompanied by a cautionary statement, (2) to any immaterial statement, or (3) when a plaintiff cannot prove the forward-looking statement was made with actual knowledge that it was false or misleading. Section 21E(c) of the 1934 Act, 15 U.S.C. § 78u–5(c).

The Reform Act codifies judicial interpretation of Section 10(b) and Rule 10b–5 and, if it had been applicable to this action, would have provided an additional statutory basis for dismissing the Second Amended Complaint.

## I. *Other Grounds Asserted Are Moot*

The other grounds upon which Defendants argue the Second Amended Complaint must be dismissed, including failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b), are moot.

## Conclusion

For the reasons set forth above, the Motion to Dismiss is granted. The Second Amended Complaint is dismissed.